# EXHIBIT A



# United States Department of the Interior
OFFICE OF THE SECRETARY
Washington, DC 20240

**NOV 0 5 2021**

The Honorable Claudia Gonzales
Chairwoman, Picayune Rancheria of
  Chukchansi Indians of California
P.O. Box 2226
Oakhurst, California 93644

Dear Chairwoman Gonzales:

On September 24, 2021, the Picayune Rancheria of Chukchansi Indians of California (Tribe) submitted to the Department of the Interior (Department) the Tribal-State Compact Between the State of California and the Picayune Rancheria of Chukchansi Indians of California (Compact).[1]

Pursuant to the Indian Gaming Regulatory Act (IGRA), the Secretary of the Interior (Secretary) may approve or disapprove a proposed compact within 45 days of its submission.[2] The Secretary may disapprove a compact only if the agreement violates IGRA, any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or the trust obligation of the United States to Indians.[3] If the Secretary does not act to approve or disapprove a compact within the 45 days, IGRA provides that it is considered to have been approved by the Secretary, "but only to the extent that the Compact is consistent with the provisions of [IGRA]."[4]

We have completed our review of the Compact, along with the additional material submitted by the Tribe and the State. Not only have we found certain provisions blatantly in violation of IGRA, but we have concerns with many of the provisions that seek to impose state control where it does not belong. For the following reasons, the Compact is disapproved as a violation of IGRA because it contains terms that are outside of the narrow scope of IGRA approved topics and are not "directly related to the operation of [Class III] gaming activities."[5]

## Summary

State governments have a limited role in the regulation of class III Indian gaming under IGRA. Anticipating that states may attempt to expand their regulatory role, Congress provided safeguards in IGRA—such as limiting the topics that can be negotiated in a compact—to ensure that tribal sovereignty and self-determination would not be undermined. As tribal gaming has evolved,

---

[1] On October 12, 2021, the Department received the State's copy of the Compact from the California Secretary of State.
[2] 25 U.S.C. § 2710(d)(8).
[3] *Id.* at § 2710(d)(8)(B).
[4] *Id.* at § 2710(d)(8)(C).
[5] 25 U.S.C. § 2710 (d)(3)(C)(vii).

however—and despite these clear statutory safeguards—states have still managed to encroach on the rights of tribes, imposing state jurisdiction and regulation in areas not directly related to a tribe's gaming operation. Moreover, states and tribes have even worked in tandem to limit the rights of other tribes in regards to potential gaming operations. We have serious concerns with this type of state encroachment and infringement on tribal sovereignty. While we cannot change decisions in the past, moving forward, we seek to ensure that compacts are negotiated strictly in accordance with IGRA and do not unintentionally or intentionally undermine tribal sovereignty.

**Background**

The Tribe has been gaming under a compact negotiated in 1999 (1999 Compact), approved by the Secretary, and published in the Federal Register in 2000, together with identical compacts approved at the same time for over 50 other tribes in California. Tribal gaming in California has grown substantially since that time, and it is now the largest gaming market in the United States. But while the Tribe's Class III gaming operations have grown only modestly since the Secretary approved the 1999 Compact, the Compact submitted to us today significantly expands upon the 1999 Compact's scope of provisions. For purposes of this decision, notable provisions from the 1999 Compact and the Compact are summarized below.

*1999 Compact Provisions*

Section 10.8 of the 1999 Compact, "Off-Reservation Environmental Impacts," provided that at least "90 days prior to the commencement of a Project . . . the Tribe shall adopt an ordinance providing for the preparation, circulation, and consideration by the Tribe of environmental impacts reports concerning potential off-reservation environmental impacts of any and all Projects to be commenced on or after the effective date of this Compact."[6] The 1999 Compact obligated the Tribe "to make a good faith effort to incorporate the policies and purposes of the National Environmental Policy Act [NEPA] and the California Environmental Quality Act [CEQA] consistent with the Tribe's governmental interests."[7]

Section 10.8.1 of the 1999 Compact defined the term "Project" as "any expansion or any significant renovation or modification of an existing Gaming Facility, or any significant excavation, construction, or development associated with the Tribe's Gaming Facility or proposed Gaming Facility."[8] The term "environmental impact reports" was defined by the 1999 Compact as "any environmental assessment, environmental impact report, or environmental impact statement, as the case may be."[9]

---

[6] 1999 Compact § 10.8.1.
[7] *Id.*
[8] 1999 Compact § 10.8.2(a)(2)(c).
[9] *Id.*

2

The term "Gaming Facility" was defined as:

> . . . any building in which Class III gaming activities or gaming operations occur or in which the business records receipts or other funds of the gaming operation are maintained but excluding offsite facilities primarily dedicated to storage of those records and financial institutions) and all rooms, buildings and areas including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class II gaming (as defined under IGRA) therein.
> 1999 Compact § 2.8

The 1999 Compact defined the term "Gaming Operation" as the "the business that offers and operates Class III Gaming Activities, whether exclusively or otherwise."[10] The term "Gaming Activities" was defined as "the Class III gaming activities authorized under this Gaming Compact."[11]

Under the 1999 Compact, the Tribe was required to "inform the public of the planned Project," "take appropriate actions to determine whether the project will have any adverse impacts on the off-Reservation environment," and "receive and respond to comments by submitting all environmental impact reports" to the State's Office of Planning and Research and the county board of supervisors for public distribution."[12] Next, the 1999 Compact required consultation with the county board of supervisors or city council, as applicable, and "meet[ing] with them to discuss mitigation of significant adverse off-Reservation impacts," as well "meet[ing] with and provid[ing] an opportunity for comment by those members of the public residing off-Reservation within the vicinity of the Gaming Facility such as might be adversely affected by the proposed Project."[13]

After commencing a Project, the 1999 Compact required the Tribe to "keep the [local governing body] and potentially affected members of the public apprized [sic] of the project's progress," together with making "good faith efforts to mitigate any and all significant adverse off-Reservation environmental impacts."[14]

*2021 Compact Provisions*

The Compact significantly expands the 1999 Compact's "Off-Reservation Environmental Impacts" provisions.[15] Under Section 11, the Tribe is not permitted to commence any construction projects until it meets all environmental review and dispute resolution procedures.[16] That section further requires

---

[10] *Id.* at § 2.7.
[11] *Id.* at § 2.4.
[12] *Id.* at §§ 10.8.2(a)(1-3).
[13] *Id.* §§ 10.8.2(a)(4-5).
[14] *Id.* at §§ 10.8.2(b)(1-2).
[15] Compact at 72-103.
[16] *Id.* § 11.1.

3

that the Tribe either prepare a Tribal Environmental Impact Document (TEID) or a Tribal Environmental Impact Report (TEIR), unless a Categorical Exemption applies.[17]

The Compact also requires the Tribe "to adopt an ordinance incorporating the processes and procedures required under section 11.0 (Tribal Environmental Protection Ordinance)" (TEPO).[18] The TEPO incorporates NEPA and CEQA policies and purposes and requires the Tribe to not only submit a TEPO to the State, but should the State disagree with any aspect of it, the Tribe must participate in dispute resolution procedures.[19]

The Compact also expands the 1999 Compact's definition of "Project" to:

> ... (i) the construction of a new Gaming Facility, (ii) a renovation, expansion or modification of an existing Gaming Facility, or (iii) *other activity involving a physical change to the reservation environment*, provided the principal purpose of which is directly related to the activities of the Gaming Operation, and any one of which may cause a Significant Effect on the Off-Reservation Environment. For purposes of this definition, section 11.0, and Appendix B, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe or its citizens by the United States.

The Compact defines "Gaming Facility" as:

> ... any building in which Gaming Activities or any Gaming Operations occur, or in which the business records, receipts, or other funds of the Gaming Operation are maintained (but excluding off-site facilities primarily dedicated to storage of those records, and financial institutions), which may include parking lots, walkways, rooms, buildings, and areas that provide amenities to Gaming Activity patrons, if and only if, the principal purpose of which is to serve the activities of the Gaming Operation and Facility rather than providing the Gaming Operation with an incidental benefit, provided that nothing herein prevents the conduct of class II gaming (as defined under IGRA) therein.
> Compact § 2.13

The term "Gaming Operation" is defined as "the business enterprise that offers and operates Gaming Activities, whether exclusively or otherwise, but does not include the Tribe's governmental or other business activities unrelated to the operation of the Gaming Facility."[20]

---

[17] *Id.* at §§ 11.1(a-b) and 11.4(a). The Tribe currently operates over 350 Gaming Devices and would fall under the TEIR requirements.
[18] Compact § 11.2.
[19] *Id.*
[20] *Id.* at § 2.14.

4

The Compact now includes a definition for the term "Interested Persons," which means "(i) all local, state, and federal agencies, which, if a Project were not taking place on Indian lands, would have responsibility for approving the Project or would exercise authority over the natural resources that may be affected by the Project, (ii) any incorporated city within six (6) miles of the Project, and (iii) persons, groups, or agencies that request in writing a notice of preparation of a draft tribal environmental impact report described in section 11.0, or have commented on the Project in writing to the Tribe or the County where those comments were provided to the Tribe."[21]

"Significant Effect(s) on the Off-Reservation Environment" means a substantial or potentially substantial adverse change, in any of the physical conditions of the off-reservation environment caused by the Project, including land, air, water, minerals, flora, fauna, ambient noise, cultural areas and objects of historic, cultural or aesthetic significance."[22]

Unless the Tribe determines that Categorical Exemption applies to the Project, a determination that is subject to challenge by the State up to and including binding arbitration, the Compact provides for an extraordinarily detailed process akin to CEQA that Tribe must follow before commencing construction or renovation of a Gaming Facility.[23] This process includes requiring the Tribe to generate detailed environmental reports, prepare studies, and issue declarations of a Project's impacts, even if such impacts are not remotely related to its gaming activities.[24] The Compact also requires the Tribe to participate in meet and confers with Interested Persons, including entities well beyond the 1999 Compact's limitation to public and local government. Should the Tribe be unable to resolve differences with all of these parties, it may ultimately have to participate in dispute resolution procedures. If the Tribe determines that "Significant Effects on the Off-Reservation Environment of a Project cannot be mitigated to a level of insignificance, the Tribe shall proceed to prepare [a TEIR.]"[25] Alternatively, a TEIR "will be required where there is substantial evidence of physical changes to the surrounding environment, including aesthetic impacts to the community character of the . environment."[26] The TIER provisions mandate issuance of a Tribal Mitigation Plan, including intergovernmental agreements."[27]

Finally, the Tribe shall not commence a Project until the local government and, if required, a Caltrans intergovernmental agreement, respectively, are executed by the parties or until any dispute related to the intergovernmental agreements is resolved, up to and including binding arbitration between the Tribe and either the local government or Caltrans, as applicable.[28]

---

[21] *Id.* at § 2.20.
[22] *Id.* at § 2.27.
[23] *See generally* Compact at, but not limited to, §§ 11.4 through 11.7 and §§ 11.11 through 11.15.
[24] Compact § 11.5.
[25] *Id.* at § 11.5 (g); the Tribe currently operates more than 349 Gaming Devices and the TEIR provisions would apply. *See supra* at n.17.
[26] *Id.* at § 11.5(h).
[27] *Id.* at § 11.15(c).
[28] *Id.* §§ 11.15(f) and 11.16.

5

**Analysis**

**Permissible Subjects of Compact Negotiation**

The Compact contains several notable provisions that exceed the limitations on compact negotiations prescribed by Congress in IGRA. In 1987, the United States Supreme Court issued its decision in *California v. Cabazon Band of Mission Indians*, which affirmed the right of tribes to conduct gaming activities on their Indian lands in states where those activities were not prohibited under a criminal statute.[29] The following year Congress enacted IGRA largely in response to the *Cabazon* decision, and declared that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity."[30] The IGRA established a statutory scheme that limited tribal gaming and sought to balance tribal, state, and Federal interests in regulating gaming activities on Indian lands. To ensure an appropriate balance between tribal and state interests, Congress limited the subjects over which tribes and states could negotiate in a class III gaming compact. Pursuant to IGRA, a tribal-state compact may include provisions relating to:

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities'

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are *directly related to the operation of gaming activities.*

25 U.S.C. § 2710(d)(3)(C) (emphasis added).

---

[29] *California v. Cabazon Band of Mission Indians*, 489 U.S. 202 (1987).
[30] 25 U.S.C. § 2701.

6

Congress included these provisions and required the Secretary review tribal-state gaming compacts to fulfill the Department's trust responsibility to tribes by enforcing these provisions and to protect tribal authority to govern their own affairs. Congress sought to safeguard against states leveraging compact negotiations to impose jurisdiction or influence over matters unrelated to gaming and solely flowing from the Tribe's inherent sovereignty.[31]

Congress included the tribal-state compact provisions to account for states' interests in the regulation and conduct of class III gaming activities, as defined by IGRA.[32] Those provisions limit the subjects over which states and tribes could negotiate a tribal-state compact.[33] In doing so, Congress also sought to establish "boundaries to restrain aggression by powerful states."[34] The legislative history of IGRA indicates that "compacts [should not] be used as subterfuge for imposing state jurisdiction on tribal lands."[35] The above referenced provisions limit the subjects over which states and tribes can negotiate a tribal-state compact.

In the Senate debate regarding S.555, which was enacted as the IGRA, Senator Evans stated:

> "As we are all aware, many Indian tribes are opposing S.555 at least in part because of the potential of extending State jurisdiction over Indian lands for certain gaming activities. I wish to make it very clear that the committee has only provided for a mechanism to permit the transfer of limited State jurisdiction over Indian lands where an Indian tribe requests such a transfer as part of a tribal-State gaming compact for class III gaming. We intend that the two sovereigns – the tribes and the States – will sit down together in negotiations on equal terms and come up with a recommended methodology for regulating class III gaming on Indian lands. Permitting the States even in this limited say in matters that are usually in the exclusive domain of tribal government has been permitted only with extreme reluctance. As discussed in the committee report, *gambling is a unique situation and our limited intrusion on the right of tribal self-governance or State-tribal relations.*"

S. Rep. No. 446, 100th Cong., 2d Sess. 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071 (emphasis added).[36]

We conduct our review of tribal-state gaming compacts against this backdrop. Tribal governments are vested with the inherent authority to regulate gaming activities on their own lands. Congress through

---

[31] 25 U.S.C. § 2702.

[32] *See* 25 U.S.C. §§ 2702(2) and 2710(b)(2)(F).

[33] 25 U.S.C. § 2710(d)(3)(c).

[34] *Rincon Band v. Schwarzenegger*, 602 F. 3d 1019 (9th Cir. 2010) (citing S. Rep. No. 100-446, at 33 (1988) (statement of Sen. John McCain)).

[35] *See* Committee Report for IGRA, S. Rep. 100-446 at 14.

[36] In the same colloquy, Sen. Inouye discussed the compact negotiation process, stating, "There is no intent on the part of Congress that the compacting methodology be used in such areas as taxation, water rights, environmental regulation, and land use." *Id.*

7

IGRA, prescribed a limited scope of a state's regulatory interests in class III gaming activities on Indian lands which are located within the state, provided the state permits the conduct of class III gaming. Therefore, we must view the scope of prescribed state regulatory authority over tribal gaming activities narrowly.[37]

## Impermissible Subjects of Compact Negotiations

When we review a tribal-state compact or amendment submitted under IGRA, we look to whether the provisions fall within the scope of categories prescribed at 25 U.S.C. § 2710(d)(3)(c). One of the most challenging aspects of this review is determining whether a particular provision adheres to the "catch-all" category at § 2710 (d)(3)(c)(vii): ". . . subjects that are directly related to the operation of gaming activities."

In the context of applying the "catch-all" category, we do not simply ask, 'but for the existence of the Tribe's class III gaming operation, would the particular subject regulated under a compact provision exist?'[38] If this question were used to provide the standard for determining whether a particular object of regulation was "directly related to the operation of gaming activities," it would permit states to use tribal-state compacts as a means to regulate tribal activities far beyond that which Congress intended when it originally enacted IGRA.[39] Instead, we must look to whether the regulated activity has a direct connection to the Tribe's conduct of class III gaming activities – "what goes on in a casino – each roll of the dice and spin of the wheel."[40]

As tribal gaming has evolved, many tribes have developed businesses or amenities that are ancillary to their gaming activities, such as hotels, conference centers, restaurants, spas, golf courses, recreational vehicle parks, water parks, and marinas. These businesses are often located near or adjacent to tribal

---

[37] *See* Testimony of Kevin K. Washburn, Assistant Secretary – Indian Affairs, before the Senate Committee on Indian Affairs, July 23, 2014 (emphasis added):

"With regard to compacts, IGRA carefully describes the topics to address in a compact. Congress specifically named six subjects related to the operation and regulation of Class III gaming activity that may be addressed in a compact, and also included a limited catchall provision authorizing the inclusion of provisions for "any other subjects that are directly related to the operation of [Class III] gaming activities." *The Department closely scrutinizes tribal-state gaming compacts and disapproves compacts that do not squarely fall within the topics delineated in IGRA.* For example, Class II gaming is not an authorized subject of negotiation for class III compacts. The regulation of Class II gaming is reserved for tribal and federal regulation."

[38] Under IGRA, it would not be appropriate for tribal-state compacts to provide for state regulation of activities such as tribal housing developments, government programs, or reservation infrastructure Those activities involve intervening factors and otherwise are not "directly related" to class III gaming activities under IGRA.

[39] In 2011, we disapproved a proposed tribal-state gaming compact because we determined that it included provisions restricting tribal land use beyond the scope of specific subjects IGRA permits tribes and states to include in class III gaming compacts. *See,* Letter from Donald Laverdure, Principal Deputy Assistant Secretary – Indian Affairs, to Kimberly Vele, President of the Stockbridge-Munsee Community of Mohican Indians (February 18, 2011) (Stockbridge-Munsee Letter). In that instance, the proposed compact restricted the Stockbridge-Munsee Community of Mohican Indians from using the proposed gaming site for any purpose other than class III gaming.

[40] *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 792 (2014).

8

gaming facilities and co-branded and co-marketed with the tribal gaming facility. Many times, they are managed with the tribal gaming facility by the business arm of the tribe. However, they ordinarily are not "directly related to the operation of gaming activities" and therefore not subject to regulation through a tribal-state gaming compact.

Mutually beneficial proximity, or even co-management alone is insufficient to establish a "direct connection" between the businesses and the class III gaming activity.[41] Because IGRA is very specific about the lawful reach of a compact, we interpret these provisions as applying only to the spaces in which gaming actually takes place – roll of the dice and spin of the wheel – or in the spaces in which other activities directly related to gaming occur. In performing this analysis, we keep in mind the Indian canons of construction and interpret this phrase to the benefit of the tribe. As such, we must construe this provision narrowly and not imply any diminishment of tribal sovereignty that does not exist.

Like many tribes, the Tribe has developed a casino resort complex, the Chukchansi Gold Resort & Casino. Beyond the casino floor where class III gaming is played by patrons on slot machines and various table games, and regulated by the Tribe's Gaming Commission, the Tribe offers multiple restaurant options, a hotel, spa, indoor/outdoor pool, and a conference center. Absent the existence of Class III gaming under IGRA, no State civil regulatory laws or local government zoning ordinances, for example, would apply to the Tribe's hotel, its restaurants, pool, spa, entertainment venue, conference center, or anywhere else on its Tribal lands.[42] We conduct our review of the Compact against this backdrop.

*Definitions*

We have repeatedly warned the State that definitions used for "Gaming Facility" and "Project" cause us significant concern because the Compact could be misconstrued to allow the State and its political subdivisions to regulate matters that are not directly related to gaming activities.[43]

These definitions are utilized throughout the Compact and result in the direct regulation of the Tribe and the Tribe's businesses and amenities that are ancillary to gaming activities. Using the "principal

---

[41] *See, e.g.*, Letter to the Honorable Peter S. Yucupicio, Chairman, Pascua Yaqui Tribe of Arizona, from the Director, Office of Indian Gaming, dated June 15, 2012, at 5, and fn. 9, discussing the American Recovery & Reinvestment Act of 2009 and IRS's "safe harbor" language to reassure potential buyers that tribally-issued bonds would be considered tax exempt by the IRS because the bonds did not finance a casino or other gaming establishment.
[42] Under Public Law 280, Congress authorized the State to enforce its criminal laws on the Tribe's lands.
[43] *See, e.g.*, Letter to the Honorable Vincent P. Armenta, Chairman, Santa Ynez Band of Chumash Mission Indians, from Kevin Washburn, Assistant Secretary – Indian Affairs (Dec. 17, 2015) (on file with the Office of Indian Gaming) (noting the Department has repeatedly warned the State of California that the definitions cause the Department concern).

9

purpose" language (as seen in the definition of "Gaming Facility") is subterfuge for use of the "but for" test, which the Department has repeatedly disavowed.[44]

The definition of Gaming Facility creates a broad interpretation of "directly related to the operation of gaming activity" that seeks to impose state regulation beyond building spaces such as the casino floor, vault, surveillance, count, casino management, casino information technology, gaming device and supplies storage areas, that are "directly related to the *operation* of class III gaming activities" and therefore subject to regulation under IGRA and an approved compact (together, "Gaming Spaces").[45]

The State submitted arguments claiming that the definitions contain limiting phrases to clarify that these definitions do not reach beyond those operations which are "directly related to gaming." Conversely, the Tribe's response explained the resort is interconnected with the gaming facility and noted it is beneficial for the Tribe to have a consistent approach for its patrons and employees at the Casino-Resort. These responses reinforce our concern that the State is using the class III gaming compact process to regulate beyond the spaces in which gaming actually takes place – roll of the dice and spin of the wheel – or in the spaces in which other activities directly related to gaming occur. The State's reliance on "principal purpose" and "but for" as the standard for "directly related" reinforces our conclusion that the State is impermissibly using the Compact to regulate beyond Gaming Spaces. Thus, we reject the State's interpretation of the term "directly related to gaming" and note that it may stifle tribal economic development.

We acknowledge that the Department affirmatively approved the Tribe's 1999 Compact. Looking back, we have concerns with the definitions of Gaming Facility, Gaming Operation, and Project, but note the effect of those definitions in the 1999 Compact were never as broad as presented by this Compact. For example, the 1999 Compact definitions, when coupled with the two-page "Off-Reservation Environmental Impacts" section's language, merely provided for public notice—including to the local government abutting the Tribe's lands, comment, and mitigation provisions, resulting in a limited and reasonable process that did not interfere with the Tribe's authority to govern itself, proceed with a project, or otherwise use its lands.

In contrast, the Compact's definitions of Gaming Facility, Gaming Operation, Project, and Interested Persons, when coupled with requirements in the 30-page Section 11, go far beyond the 1999 Compact.

For example, where the 1999 Compact required notice to the public and the local government, the Compact's definition of Interested Persons that must be notified of the Tribe's contemplated Project under Section 11 now includes:

---

[44] *Supra* n.40; Letter to the Honorable Chris Wright, Chairman, Dry Creek Rancheria Band of Pomo Indians, from John Tahsuda, Principal Deputy Assistant Secretary – Indian Affairs (Dec. 15, 2017) (noting that activities that are only indirectly related to gaming activities are not proper subjects for tribal-state gaming compacts).
[45] 25 U.S.C. 2710(d)(3)(C).

10

(i) all local, state, and federal agencies, which, *if a Project were not taking place on Indian lands, would have responsibility for approving the Project or would exercise authority over the natural resources that may be affected by the Project, (ii) any incorporated city within six (6) miles of the Project*, and (iii) persons, groups, or agencies that request in writing a notice of preparation of a draft tribal environmental impact report described in section 11.0, or have commented on the Project in writing to the Tribe or the County where those comments were provided to the Tribe." (Emphasis added.)

Even if we were to read the definitions of Gaming Facility, Gaming Operation, and Project, to *exclude* anything beyond the building's Gaming Spaces that are indisputably directly related to the *operation* of class III gaming activities, the Compact's provisions require notice and comment by individuals and entities that have the effect of interfering with the Tribe's ability to govern itself, proceed with a project, or otherwise use its lands.

*Environmental Regulation*

Triggered by the definitions discussed above, the Compact at Section 11 requires the Tribe to implement State environmental law and regulations for on-reservation projects. These provisions apply to any construction or renovation at the Gaming Facility – i.e., the entire casino-resort complex – and "any activity involving a physical change to the reservation environment, the principal purpose of which is directly related to the activities of the Gaming Operation." Further, section 11.15(e) requires the Tribe to enter into intergovernmental agreements with the County, the City, and Caltrans prior to commencement of a project. Section 11.15(b)(3) requires that these intergovernmental agreements include compensation (payment) from the Tribe to the local governments for mitigation of effects on public safety and for public services provided to the Tribe. In effect, any project funded by, organized by, or related to, the Tribe's gaming business enterprise will trigger these provisions.

As written, these provisions address potential environmental impacts from on-reservation tribal activity that is not directly related to the "roll of the dice and the spin of the wheel." Instead, Section 11 reaches far beyond a renovation of the casino floor, for example, to any renovations in the entire resort complex, and any other renovations or construction of on-reservation business operated by the Tribe's gaming business enterprise. Moreover the requirement to enter into an intergovernmental agreement prior to commencement of a project provides local governments an effective veto over an on-reservation Tribal project. Therefore, these provisions, as written, fall outside of the narrow range of topics IGRA permits in a compact and must be disapproved.

The Tribe and the State submitted supplementary information, which argued that these provisions were narrowly tailored to identify and address any potential "negative externalities caused by gaming." The State further argued that the environmental review is effectuated not through application of state law within the reservation, but through a Tribal Environmental Protection Ordinance (TEPO). Section 11.2 of the Compact requires that the Tribe adopt an ordinance that "will incorporate the relevant policies and purposes of NEPA [the National Environmental Policy Act] and CEQA [California Environmental Quality Act]." Although this passage is similar to Section 10.8 of the 1999 Compact, the Compact

11

goes on to require the Tribe to "submit its [TEPO] to the State" and, "[i]f the State identifies aspects of the [TEPO] that it believes are inconsistent with section 11.0, the matter will be resolved in accordance with the dispute resolution provisions of section 13.0."[46] That Section governs dispute resolution, including binding arbitration, which means that the TEPO could ultimately be imposed by an arbitration decision.

Further, at each relevant stage of the Tribe's environmental review process, the Compact requires the Tribe to notify the State of its determination and allow for the State to object to the Tribe's determination. If the State objects and Tribe and the State are unable to resolve the issue, the Compact's environmental dispute resolution sections are triggered, including binding arbitration in some instances.

We are unpersuaded that these provisions are narrowly tailored to address only the potential negative externalities caused by gaming. Further, requiring a Tribe to adopt state law or its equivalent and permitting for the State to review and object to the Tribe's environmental review is effectively one step removed from the direct application of State law on the Tribe's reservation. As noted above, the broad definitions used in the Compact extend the reach of these provisions far beyond potential changes to the Tribe's casino floor.

*Tobacco*

The Compact at section 12.2, regulates the Tribe's sales of tobacco, a topic that is well outside of the scope of IGRA's compact provisions. Section 12.2 in relevant part states: "[t]he Tribe will not permit the sales of tobacco products to persons under age twenty-one (21)." This provision directly regulates the Tribe's sales of tobacco products. In 2004, the Department severed a provision in the model Oklahoma gaming compact because it included tobacco.[47] Similarly, in 2012, the Department disapproved a compact between the State of Massachusetts and the Mashpee Wampanoag Tribe because that compact included several topics outside the scope of IGRA's compact provisions.[48] In both cases the Department pointed to IGRA's text and legislative history as prohibiting states from using the IGRA compact process as subterfuge for imposing state jurisdiction on Tribes concerning issues not related to gaming.

The State responded to our concerns on this issue by noting that "Federal law presently prohibits retailers from selling tobacco products to anyone under 21 years of age. 21 U.S.C. § 387f(d). Thus, under federal law, the Tribe is not authorized to sell tobacco products to anyone under the age of 21." This does not change our concern that this provision is not directly related to gaming. The regulation

---

[46] Compact § 11.2.

[47] *See, e.g.*, Letter to the Honorable Kenneth Blanchard, Governor Absentee Shawnee Tribe of Oklahoma, from the Principal Deputy Assistant Secretary – Indian Affairs, dated Dec. 17, 2004, approving the 2004 Oklahoma compact while severing Part 15D which related to the Tobacco Compact.

[48] Letter to the Honorable Cedric Cromwell, Chairperson, Mashpee Wampanoag Tribe, from Kevin Washburn, Assistant Secretary – Indian Affairs, dated Oct. 12, 2012, disapproving the Tribe's 2012 compact.

of the sales of tobacco is well beyond the permitted scope of a class III gaming compact, therefore a clear violation of IGRA, and must be disapproved here, as in the other compacts where it appeared.

*Other Concerns*

In addition to the violations of IGRA discussed above, we have concerns with other provisions as well. Section 12.5 and Appendix F-2 requires the Tribe to adopt a tort claim ordinance which covers tort claims "arising out of, connected with, or relating to the operation of the Gaming Operation, the Gaming Facility, or the Gaming Activity." We are highly concerned with the State requiring the Tribe to adopt a tort claim ordinance that could be interpreted to apply to more than just activity directly related to gaming.

In addition, the Department is concerned with Section 11.19, which provides that the State will consult with the Tribe if another tribe plans to open or expand a tribal gaming facility within 60 miles of the Tribe's gaming facility. While this provision does not go nearly as far in creating barriers for other tribes seeking to engage in IGRA gaming as some compact provisions have,[49] we subscribe to the view that these provisions are "anathema to the basic notions of fairness in competition and inconsistent with the goals of IGRA."[50]

## Conclusion

We understand the Tribe and the State worked hard to negotiate a Compact that met the parties needs. The Department frequently provides technical assistance to Tribes and States negotiating compacts to help ensure the Compact reflects the proper scope of a class III gaming compact as proscribed by IGRA. For the reasons stated above we disapprove this Compact. We regret our decision could not be more favorable at this time. A similar letter is being sent to the Honorable Claudia Gonzales, Chairwoman, Picayune Rancheria of Chukchansi Indians of California.

Sincerely,

Bryan Newland
Assistant Secretary – Indian Affairs

---

[49] *See* Letter to the Honorable Troy Swallow, President, Ho-Chunk Nation, from Acting Assistant Secretary – Indian Affairs, dated Aug. 15, 2003, at 2 (describing the anti-competitive provision as "creating a disincentive for the state to concur in a Secretarial two-part determination" and "repugnant to the spirit of IGRA").

[50] Letter to the Honorable Harold Frank, Chairman, Forest County Potawatomi Community, from Kevin Washburn, Assistant Secretary – Indian Affairs, dated Jan. 9, 2015, at 3, quoting a 2003 Letter to Harold "Gus" Frank, Chairman, Forest County Potawatomi Community, from Aurene Martin, Acting Assistant Secretary – Indian Affairs (April 25, 2003).