UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS,

Plaintiff,

v.

GAVIN NEWSOM, Governor of the State of California, and STATE OF CALIFORNIA,

Defendants.

No. 1:24-cv-01312-KES-BAM

ORDER GRANTING MOTION TO DISMISS

(Doc. 19)

This is an action brought by the Picayune Rancheria of the Chukchansi Indians (the "Tribe" or "Picayune"), a federally recognized Indian Tribe, against Governor Gavin Newsom and the State of California (collectively, the "State" or "California") for the State's alleged failure to negotiate in good faith in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2710, *et seq*. ("IGRA"), and in violation of state law. Doc. 18 ("FAC"). The State moves to dismiss the sixth, seventh, and eighth causes of action, each of which asserts a violation of state law. Doc. 19 ("MTD").

The State argues that the state law claims should be dismissed because: (1) the State has not waived its sovereign immunity with respect to such claims; (2) the Tribe lacks Article III standing as to the state law claims; (3) the Tribe fails to state a claim under the state laws; and (4) the claims are based on offers made in negotiation that have no force and effect. MTD at 13–23.

For the reasons explained below, the Court grants the motion to dismiss.

## I. Background

### a. The Indian Gaming Regulatory Act ("IGRA")

Although "[t]he policy of leaving Indians free from state [regulatory] jurisdiction and control is deeply rooted in the Nation's history," the Indian Gaming Regulatory Act ("IGRA") formally codified a negotiation process through which state governments may have some regulatory control over tribal gaming operations. *Chicken Ranch Rancheria of Me-Wuk Indians v. California* ("*Chicken Ranch*"), 42 F.4th 1024, 1050–53 (9th Cir. 2022) (Wardlaw, J., concurring). IGRA separates gaming into three classes. *See* 25 U.S.C. § 2710(a)–(b), (d). Only Class III gaming, which enables Las Vegas-style casino gambling, is relevant here. *See* 25 U.S.C. § 2710(d). To conduct class III gaming, an Indian tribe must, among other things, enter into a tribal-state compact with the state in which the tribe's reservation lies. 25 U.S.C. § 2710(d)(1)(C).

IGRA's compact requirement gives states "unique and limited powers over Indian tribes," *Chicken Ranch*, 42 F.4th at 1031, by permitting states to negotiate the terms of tribal-state gaming compacts, such as "rules for operating gaming, [the allocation of] law enforcement authority between the tribe and State, and [] remedies for breach of the agreement's terms." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014) (citing 25 U.S.C. § 2710(d)(3)(C)). "The risks inherent in the state compact approval requirement are therefore obvious: Indian tribes, who rely on gaming for economic revenue, are at the potential mercy of the states, which could withhold approval of Class III gaming rights or insist upon onerous compact conditions that would give states greater power to regulate tribes." *Chicken Ranch*, 42 F.4th at 1032.

Congress recognized these risks, and IGRA contains several important safeguards. *Id.* Foremost among them, "states have an obligation to engage in compact negotiations in good faith." *Id.* at 1033 (citing 25 U.S.C. § 2710(d)(3)(A)). A tribe may sue in federal court if it believes a state has disregarded this duty. *See* 25 U.S.C. § 2710(d)(7)(A)(i), (B)(i). If a court finds that a state failed to negotiate in good faith, it must order the state and the tribe to conclude a compact within sixty days. *Id.* § 2710(d)(7)(B)(iii). If, after sixty days, the parties fail to reach

agreement, the court must appoint a mediator to whom each of the parties submit a compact representing each party's last best offer. *Id.* § 2710(d)(7)(B)(iv). The mediator must choose the compact which most closely adheres to IGRA, federal law, and the district court's order. *Id.* § 2710(d)(7)(B)(iv)–(v). If the state does not consent to the compact chosen by the mediator, the Secretary of the Interior must prescribe the conditions under which the tribe may conduct class III gaming, adhering closely to the terms of the compact chosen by the mediator and IGRA. *Id.* § 2710(d)(7)(B)(vii).

**b. Historical Background of the State Laws Enacted in Response to IGRA**

Following the passage of IGRA, a group of tribes in California sought to negotiate compacts with the State which would allow them to conduct live banked or percentage card games and operate stand-alone electronic gaming machines, some of the most lucrative forms of class III gaming. *In re Indian Gaming Related Cases* ("*Coyote Valley II*"), 331 F.3d 1094, 1098 (9th Cir. 2003). But the State did not negotiate. *See id.* And the Supreme Court held in *Seminole Tribe of Florida v. Florida* that IGRA's abrogation of state sovereign immunity violated the Eleventh Amendment. 517 U.S. 44, 47 (1996). Without the State's consent to suit, the tribes had no legal recourse for the State's refusal to negotiate.

The tribes formed a coalition which proposed California Proposition 5 in 1998, "an initiative aimed at establishing a voter-backed model compact that would legalize [] electronic gaming machines." K. Alexa Koenig, *Gambling on Proposition 1A: The California Indian Self-Reliance Act*, 36 U.S.F. L. Rev. 1033, 1041–42 (2002). Proposition 5 was enacted and waived the State's sovereign immunity. It required the State to enter into a model "Tribal–State Gaming Compact" with Indian tribes to allow certain class III gambling activities. *See id.* It also set out the procedures for entering into the model "Tribal–State Gaming Compact." *Id.*

Proposition 5's model "Tribal–State Gaming Compact" was codified at California Government Code § 98004; its waiver of sovereign immunity was codified at California Government Code § 98005. *See* Cal. Gov't Code §§ 98004–98005. But the California Supreme Court struck down the portion of Proposition 5 that required the State to enter into the model "Tribal–State Gaming Compact," based on the California Constitution's prohibition of Las

Vegas-style gambling. *See Hotel Employees & Restaurant Employees Int'l Union v. Davis* ("*HERE*"), 21 Cal. 4th 585 (Cal. 1999).

California voters thereafter passed Proposition 1A, which amended the California Constitution to except tribal gaming from the Constitution's prohibition of Las Vegas-style gambling. *In re Indian Gaming Related Cases* ("*Coyote Valley II*"), 331 F.3d 1094, 1103 (9th Cir. 2003); FAC ¶ 16. To implement Proposition 1A and the compacts, the State legislature enacted California Government Code sections 12012.25, 12012.75, and 12012.85, which establish the Revenue Sharing Trust Fund ("RSTF") and the Special Distribution Fund ("SDF"). FAC ¶ 18; Cal. Gov. Code §§ 12012.25, 12012.75, and 12012.85; 1999 Cal. Legis. Serv. 874 (West). Section 12012.2(d) provides that the "Governor is the designated state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the State of California pursuant to [IGRA] for the purposes of authorizing class III gaming, as defined in that act, on Indian lands within this state." Cal. Gov. Code § 12012.2(d).

The State and fifty-seven tribes, including Picayune, entered into a tribal state compact which adhered closely to the model "Tribal–State Gaming Compact" on September 9, 1999. *Coyote Valley II*, 331 F.3d at 1104–05; Doc. 18 ("FAC") ¶¶ 19, 25. Under the terms of the compacts, gaming tribes would pay into the RSTF according to a progressive fee structure, and the funds would be used to distribute $1.1 million to each non-gaming tribe in California each year. FAC ¶¶ 103–05. The SDF would be used to cover shortfalls in the RSTF and to reimburse the State for its costs in regulating tribal gaming, among other things. *Id.* ¶¶ 67, 116–18.

The Tribe's compact has been in force since then, FAC ¶ 25, and during this time, "[t]ribal gaming in California has grown . . . [to become] the largest gaming market in the United States." Doc. 18-1, Ex. A ("Disapproval Letter") at 2. The Tribe developed the Chukchansi Gold Resort & Casino, where class III games are played. Disapproval Letter at 10.

///

///

///

**c. The New Compact Negotiations**[1]

Over a ten year period, the Tribe and the State attempted to negotiate and enter into a new compact to replace the 1999 compact. FAC ¶¶ 27, 46–48. Beginning in August 2014, the Tribe joined the Compact Tribes Steering Committee, a coalition of federally recognized Indian tribes, for purposes of negotiation. *Id.* ¶ 27. Roughly seven years later, the Tribe and the State reached agreement on a new compact and, as required by IGRA, submitted the agreed compact to the Secretary of Indian Affairs for approval. *Id.* ¶ 28.

The Assistant Secretary of Indian Affairs disapproved the compact, finding that certain provisions violated IGRA. *Id.* ¶ 29; Doc. 18-1, Ex. A ("Disapproval Letter") at 2. The Disapproval Letter emphasized that the compact defined terms such as "Gaming Facility" and "Gaming Operation" too broadly, and because it imposed state environmental regulations on those "Gaming Facilities," it extended "state control where it does not belong." Disapproval Letter at 2, 10–14; FAC ¶ 29.[2]

The Tribe and the State restarted negotiations in October 2022. FAC ¶ 32. The Tribe asserts that the State continued to insist on provisions similar to those that were found to be off-limits by the Assistant Secretary and by the Ninth Circuit in *Chicken Ranch*, and after a year of further unsuccessful negotiations, the Tribe hired new counsel to lead its negotiations. *Id.* ¶ 35.

In January 2024, the Tribe submitted a new compact proposal with substantial revisions to its previous drafts. *Id.* ¶ 36. Over the next six months, the Tribe and the State convened for eight negotiation sessions and exchanged drafts. *Id.* ¶¶ 37–44. The Tribe took issue with many of the

---

[1] This recitation of facts is taken from the Tribe's complaint. These allegations are assumed to be true for purposes of the pending motion. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

[2] In *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, the Ninth Circuit found that the State had failed to negotiate in good faith with other tribes who were members of the Compact Tribes Steering Committee by insisting on these state environmental, tort, and family law provisions during compact negotiations. 42 F.4th at 1029–30; FAC ¶¶ 20–24. The Tribe's negotiations took a different course than the plaintiff tribes in *Chicken Ranch*—who were also members of the Compact Tribes Steering Committee—because those tribes did not agree to the provisions, sued the State for its failure to negotiate in good faith, and were ordered to follow IGRA's remedial framework. *See Chicken Ranch*, 42 F.4th at 1049; *see also, e.g.*, Doc. 79, *Cachil Dehe Band of Wintun Indians v. Newsom*, 2:20-cv-1585-KES-SKO (stipulation for summary judgment following *Chicken Ranch*).

State's proposed compact provisions, contending that the State's proposals overstepped the boundaries of IGRA. *See id.*

During the 2024 negotiations, the 1999 compact was set to expire on December 31, 2024.[3] *Id.* Due to the impending termination of the 1999 compact, the parties exchanged their last compact offers to one another in July 2024. *Id.* ¶¶ 46–47. The Tribe rejected the State's last offer on July 19, 2024, and the State rejected the Tribe's last offer on July 28, 2024. *Id.* ¶¶ 47–48. Subsequently, the State agreed to extend the 1999 compact to December 31, 2025. *Id.* ¶ 49.

## II. <u>The Tribe's Claims</u>

The Tribe brings five causes of action under IGRA. *Id.* ¶¶ 51–96. The Tribe asserts that the following compact provisions were impermissible topics of negotiation under IGRA and that the State negotiated in bad faith by insisting upon them: First, the State insisted that the compact include a provision prohibiting the Tribe's gaming operation from cashing any check drawn against a federal, state, county, or city fund, including, but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments, except for checks issued to the Tribe's members. *Id.* ¶¶ 43, 52–54. Second, the State insisted that the compact include a provision requiring the Tribe to comply with a memorandum of understanding with the County of Madera that would require it to make payments to the County of Madera. *Id.* ¶¶ 38, 40, 44, 56–61. Third, the State insisted that the Tribe pay two percent of the net win from its gaming machines into an Impact Mitigation Fund that would be disbursed to local governments. *Id.* ¶¶ 38, 40, 67–71. Fourth, the State insisted that the Tribe pay into the SDF on a pro rata basis at an amount that was more than necessary to defray the costs that the State incurs in regulating the Tribe's class III gaming activities under the compact. *Id.* ¶¶ 39–43, 76–81. Fifth, the State insisted that the compact include a provision that would obligate the Tribe to make supplementary payments into the RSTF, and these supplementary payments would be greater than the amount necessary to pay $1.1 million to each non-gaming tribe. *Id.* ¶¶ 39–43, 86–96.

---

[3] The Tribe's 1999 compact with the State was previously set to expire on December 31, 2020, but that expiration date was extended multiple times as the Tribe and the State continued to negotiate on the terms of a new compact. *See* FAC ¶¶ 26, 31, 49.

The Tribe also brings three state law causes of action. *Id.* ¶¶ 123. The sixth claim seeks a declaratory judgment and equitable relief on the grounds that article IV, section 19(f) of the California Constitution, and California Government Code section 12012.25(d), place a mandatory duty on the Governor to negotiate tribal-state gaming compacts in good faith, and that for the reasons identified in each of the previous claims, the Governor failed to do so. *Id.* ¶¶ 97–101.

The seventh claim asserts that, by insisting that the Tribe pay an amount greater than necessary to distribute $1.1 million to each eligible non-gaming tribe, the State violated the good faith requirement imposed by article IV, section 19(f) of the California Constitution and California Government Code sections 12012.25 and 98005. *Id.* ¶¶ 102–14. The Tribe asserts that this demand was not in good faith because it was inconsistent with state law mandates governing the distribution of the SDF, *see* Cal. Gov't Code §§ 12012.85, 12012.90, the RSTF, *see* Cal. Gov't Code §§ 12012.75, 12012.90, and the Tribal Nation Gaming Fund ("TNGF"), *see* Cal. Gov't Code § 12019.35. FAC ¶¶ 102–14.

The eighth claim asserts that, by insisting that the Tribe pay into the SDF on a pro rata basis to defray the State's costs in regulating class III gaming, the State violated the good faith requirement imposed by article IV, section 19(f) of the California Constitution and California Government Code sections 12012.25 and 98005. *Id.* ¶ 123. The Tribe points out that California Government Code section 12012.85(g) establishes a hierarchy of uses for funds that are paid into the SDF, and defraying the State's regulatory costs is the third priority. *Id.* The Tribe asserts that, by limiting the use of the funds in the compact to reimbursement for regulatory costs, the State contravened this section and, therefore, violated its duty to act in good faith.

The State filed a motion to dismiss the sixth, seventh, and eighth claims. Doc. 19 ("MTD"). The Tribe filed an opposition, Doc. 22 ("Opp'n"), and the State filed a reply, Doc. 24 ("Reply").

## III. <u>Legal Standard</u>

### a. Rule 12(b)(1)

A party may move to dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1). Fed. R. Civ. P. (b)(1). A motion to dismiss for lack of subject-matter jurisdiction

pursuant to Rule 12(b)(1) may be facial or factual. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

**b. Rule 12(b)(6)**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983); Fed. R. Civ. P. 12(b)(6). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must contain facts that "nudge [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). But the court need not assume the truth of legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 680. While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also id.* at 678 ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## IV. Discussion and Analysis

The State moves to dismiss the Tribe's state law claims on several grounds. The State argues that (1) sovereign immunity bars the state law claims; (2) the Tribe lacks Article III standing to bring the state law claims; (3) the Tribe fails to state a claim because each of the state law causes of action is premised on the legally incorrect assumption that the state law provisions impose a mandatory duty on the Governor to negotiate in good faith; and (4) the claims fail because they are based on offers which were not accepted and therefore have no force and effect. MTD at 13–20. The State also argues, in the alternative, that the Court should exercise its discretion to decline supplemental jurisdiction over the state law claims because they present novel and complex issues of state law. MTD at 21–23.

### a. Waiver of Sovereign Immunity as to the State Law Claims

The State argues that California Government Code section 98005 does not waive its sovereign immunity as to the Tribe's state law claims. MTD at 13–15. The State acknowledges that section 98005 waives the State's sovereign immunity as to IGRA claims, but it contends that section 98005 should be read narrowly to find no such waiver as to the state law claims at issue here. *See id.* This argument is unpersuasive.

The Eleventh Amendment provides that a state is not "subject to suit in federal court unless it has consented to suit . . . ." *Blatchford v. Native Vill. of Noatak and Circle Vill.*, 501 U.S. 775, 779 (1991). A statute's waiver of sovereign immunity must be unambiguous. *Hunsaker v. United States*, 902 F.3d 963, 966–67 (9th Cir. 2018). When a waiver is ambiguous or a "statute is susceptible of multiple plausible interpretations," courts "will not consider a State to have waived its sovereign immunity." *Sossamon v. Texas*, 563 U.S. 277, 287 (2011) (citations omitted). But the legislature "'need not state its intent' to waive the government's immunity 'in any particular way' or 'use magic words.'" *Hunsaker*, 902 F.3d at 967 (quoting *F.A.A. v. Cooper*,

566 U.S. 284, 291 (2012)). To interpret a waiver of sovereign immunity, a court should begin with "the plain meaning of the statute's text," *id.* (quoting *In re Roman Catholic Archbishop of Portland in Or.*, 661 F.3d 417, 432 (9th Cir. 2011)), and should "end[] [the inquiry] there as well if the text is unambiguous." *Bedroc Ltd. v. United States*, 541 U.S. 176, 183 (2004).

California Government Code section 98005 provides in relevant part:

> [T]he State of California also submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting *any cause of action* arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith, the state's refusal to enter into negotiations concerning the amendment of a Tribal-State compact to which the state is a party, or to negotiate in good faith concerning that amendment, or the state's violation of the terms of any Tribal-State compact to which the state is or may become a party.

Cal. Gov't Code § 98005 (emphasis added).

The Tribe's state law claims, each of which is grounded in the contention that the State failed to negotiate in good faith concerning the Tribal-State compact, are included within the scope of the phrase "*any* cause of action arising from the state's refusal . . . to conduct [Tribal-State compact] negotiations in good faith . . . ." *Id.* The use of the word "any" in the phrase "any cause of action" confirms that the waiver is not limited to federal law causes of action.[4] Had the drafters of Proposition 5 intended to limit the waiver only to causes of action arising under IGRA, or only to causes of action arising under federal law, as the State contends, the statute could have qualified the term "cause of action" by using "IGRA cause of action" or "federal cause of action." Instead, it used the phrase "*any* cause of action." Cal. Gov't Code § 98005 (emphasis added).

This plain reading—that "any cause of action" is not limited to "federal" causes of action—is supported by the fact that the legislature chose not to so limit "any cause of action," even though it chose to limit the type of tribe that could bring a claim to "federally-recognized"

[4] "Any," used as an adjective, is defined as: (1) "one or some indiscriminately of whatever kind"; (2) "one, some, or all indiscriminately of whatever quantity"; and (3) "unmeasured or unlimited in amount, number, or extent." *Any*, Meriam-Webster.com, https://www.merriam-webster.com/dictionary/any (last visited August 26, 2026).

tribes. The statute provides that the State waives its sovereign immunity for claims brought by "any federally recognized California Indian tribe . . . ." *Id.* The statute thus places qualitative limits on the kind of Indian tribe—those that are "federally recognized" and are "California" tribes—that can bring a cause of action. But the statute does not include those qualitative limitations on the type of "cause of action" that a tribe may bring. "[A]ny cause of action" encompasses causes of action arising under both federal and state law, so long as they "aris[e] from the state's refusal . . . to conduct [Tribal-State compact] negotiations in good faith . . . ." Cal. Gov't Code § 98005.

The State fails to identify any ambiguity in the text. While the State emphasizes that the waiver provision references negotiation of a "Tribal-State compact pursuant to IGRA," this reference simply indicates the type of underlying *conduct* for which the states is waiving immunity: *e.g.*, "the state's refusal to enter into negotiations" with a tribe "for the purpose of entering into a different Tribal-State compact pursuant to IGRA." Cal. Gov't Code § 98005.[5] The phrase does not purport to limit the sovereign immunity waiver to only federal causes of action. There is no textual support for the State's argument that the phrase "any cause of action" in § 98005 should be read as "any IGRA cause of action."

The State also points to the timing of the enactment of section 98005. MTD at 15. The State notes that section 98005 was enacted before the state provisions at issue in the Tribe's

---

[5] Proposition 5, from which section 98005 is derived, contained a model Gaming Compact provision which was offered by the State to any federally recognized California Indian Tribe, and set out a process by which tribes could accept the model Gaming Compact. *HERE*, 21 Cal. 4th at 599 (citing Cal. Gov't Code § 98004). The first sentence of section 98005, which *HERE* held unconstitutional because it was not severable from the model compact provisions, waived the State's sovereign immunity to "any cause of action arising from the state's refusal to execute the [*model*] Gaming Compact offered in Section 98004 . . . ." Cal. Gov't Code § 98005. The final sentence, on the other hand, waived the State's sovereign immunity to "any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a *different* Tribal-State compact pursuant to IGRA . . . ." *Id.* The California Supreme Court found that the final sentence of section 98005 was severable from Proposition 5's other provisions. *See HERE*, 21 Cal. 4th at 612–15 ("The consent to suit contained in the final sentence of Government Code section 98005 is functionally separable from the measure's . . . model compact. It concerns neither the scope of gambling permitted to tribes nor the implementation of the model compact but, rather, the resolution of future disputes concerning the negotiation, amendment and performance of compacts 'different' from Proposition 5's model compact.").

motion, and according to the State, "it makes little sense to suggest that a waiver enacted in 1998 . . . would waive the State's sovereign immunity against claims arising under state statutes enacted much later." MTD at 15. But a court should "generally assume[] that, when [the legislature] enacts statutes, it is aware of [] relevant precedents." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685 (2022); *see also Gerawan Farming, Inc. v. Ag. Lab. Relations Bd.*, 3 Cal. 5th 1118, 1155–56 (Cal. 2017) (same in the state context). The California Supreme Court had held in *HERE* that section 98005 constituted a valid waiver of sovereign immunity, *see HERE*, 21 Cal. 4th at 612–15. If the legislature intended to insulate the State from claims in federal court arising under state law, it could have amended section 98005 to limit the causes of action subject to the waiver of sovereign immunity to federal claims under IGRA. It did not do so.

In sum, the State waived its sovereign immunity to "*any* cause of action arising from the state's refusal . . . to conduct [Tribal-State compact] negotiations in good faith . . . ." Cal. Gov't Code § 98005 (emphasis added). This waiver encompasses the Tribe's state law claims.

**b. Standing to Bring the State Law Claims**

The State argues next that the Tribe lacks Article III standing to bring the state law claims. MTD at 16–17. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth v. Laidlaw Envt'l Serv.*, 528 U.S. 167, 180–81 (2000). The State contends that the Tribe's state law claims fail to satisfy the redressability requirement because the Tribe seeks only a declaratory judgment and, according to the State, a declaratory judgment will not redress the Tribe's injuries. MTD at 16–17. This argument likewise fails.

The redressability requirement is satisfied when a plaintiff shows "that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations omitted). "The plaintiff's burden [to establish a substantial likelihood of redressability] is 'relatively modest.'" *Renee v.*

*Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Bennett v. Spear,* 520 U.S. 154, 171 (1997)). A plaintiff "need not demonstrate that there is a guarantee that [its] injuries will be redressed by a favorable decision; rather, a plaintiff need only show a substantial likelihood that the relief sought would redress the injury." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (internal quotations and citations omitted). "If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision." *Id.* A court should assume, when determining whether an injury is redressable, that the "plaintiff's claim has legal merit." *Bonnichsen v. United States*, 367 F.3d 864 (2004); *see Hall v. Norton,* 266 F.3d 969, 976–77 (9th Cir. 2001) ("The purpose of the standing doctrine is to ensure that the plaintiff has a concrete dispute with the defendant, not that the plaintiff will ultimately prevail against the defendant.").

If the Tribe prevailed on its state law claims, there is a likelihood that the declaratory judgment sought by the Tribe would redress its injuries—IGRA's remedial process compels this conclusion. If this Court finds that the State failed to negotiate in good faith, it must order the State and the Tribe to enter IGRA's remedial process. 25 U.S.C. § 2710(d)(7)(B)(iii). Pursuant to that order, if the parties do not conclude a compact within sixty days, the Court appoints a mediator, and the Tribe and the State must submit their last best offer to the mediator. *Id.*

The mediator must then "select from the two proposed compacts the one which best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court." *Id.* Assuming the Tribe prevails on its state claims, that finding would include that the State violated state law. One of the mediator's considerations in reviewing the compacts would be whether the State's proposed compact contained provisions that the Court found in violation of state law, and this would disincentivize the State from including those provisions in its compact proposals during the remedial process. IGRA's constraints on the mediator's discretion to select a compact thus render it likely, as opposed to merely speculative, that the requested declaratory relief would redress the Tribe's injuries. *See Lujan*, 504 U.S. at 561. In sum, a favorable decision would likely redress the Tribe's injuries, and the Tribe has

standing to bring its state law claims.[6]

**c. The Tribe's State Law Causes of Action Fail to State a Claim**

The State argues that the Tribe's state law claims fail under Rule 12(b)(6) because each is premised on the notion that state law places a mandatory duty on the Governor to negotiate in good faith with the Tribe to reach a compact. MTD at 17–20. The Tribe does not dispute that its claims are premised on this legal assumption. *See* Opp'n at 15–18. The Tribe identifies this alleged mandatory duty in section 19(f), article IV of the California Constitution and California Government Code section 12012.25. *See* FAC ¶¶ 97–101, 114–23; Opp'n at 15–18. The Tribe does not cite to any California or federal case supporting its assertion that these state law provisions impose a mandatory duty to negotiate with the Tribe in good faith to reach a compact.

"When [California courts] interpret statutes, [they] usually begin by considering the ordinary and usual meaning of the law's terms, viewing them in their context within the statute." *In re Friend*, 11 Cal. 5th 720, 730 (2021). "If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." *Holland v. Assessment App. Bd. No. 1*, 58 Cal. 4th 482, 490 (2014) (quoting *Fitch v. Selects Prods. Co.*, 36 Cal. 4th 812, 818 (2005)). "If,

---

[6] The State relies on *Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020), asserting that a "declaration, although undoubtedly likely to benefit the plaintiff[] psychologically, is unlikely by itself to remediate their alleged injuries absent further court action." MTD at 16. The State's reliance on *Juliana* is misplaced. In *Juliana,* the plaintiffs sought a declaration that the federal government had violated their asserted constitutional right to "a climate system capable of sustaining human life" by promoting fossil fuel use. 947 F.3d at 1164–65, 1169–70. The Ninth Circuit explained that such a declaration, even if accompanied by an injunction against the federal government's permitting of fossil fuels, would not redress the plaintiffs' injuries because "enjoining those activities [would not] . . . suffice to stop catastrophic climate change." *Id.* at 1170. The plaintiffs' experts opined that the only way to stop climate change was a "fundamental transformation of [the] energy system . . . of the [entire] industrialized world," and it would have to "include everything from energy efficient lighting to improved public transportation to hydrogen-powered aircraft." *Id.* at 1170–71. The relief the plaintiffs sought, therefore, would not redress their injuries absent further court order, such as "a plan subject to judicial approval to draw down harmful emissions." *Id.* Unlike the incremental relief that the *Juliana* plaintiffs sought, the result of a ruling in the Tribe's favor would be a finding that the State failed to negotiate in good faith by insisting on provisions inconsistent with state law. *See* FAC ¶¶ 100, 114, 123. Such a finding would be likely to redress the Tribe's injuries because, as explained above, the State would be dissuaded from continuing to propose those provisions, and the mediator would be less likely to select the State's proposed compact if it did continue to propose such provisions. No further court order would be required.

however, the statutory language may reasonably be given more than one interpretation, [courts] may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." *Id.* (quoting *Torres v. Parkhouse Tire Service, Inc.*, 26 Cal. 4th 995, 1003 (Cal. 2001)). "Pragmatism guides this analysis." *Alturas Indian Rancheria v. Newsom*, No. 2:22-cv-01486-KJM-DMC, 2023 WL 3025225, at *2 (E.D. Cal. Apr. 20, 2023).

Article IV, section 19(f) of the California Constitution provides, in relevant part, that "the Governor is *authorized* to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." Cal. Const., art. IV, § 19(f) (emphasis added). California Government Code section 12012.25(d) provides that "[t]he Governor is the designated state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the State of California pursuant to the federal Indian Gaming Regulatory Act of 1988 . . . for the purpose of authorizing class III gaming . . . ." Cal. Gov't Code § 12012.25(d). The relevant terms in these statutes are permissive, rather than obligatory.[7]

But while state law authorizes the Governor to negotiate with the Tribe, it is *federal* law that imposes the duty to negotiate in good faith with the Tribe on a compact. IGRA requires that "the State *shall* negotiate with the Indian tribe in good faith to enter into [] a compact." 25 U.S.C. § 2710(d)(3)(A) (emphasis added).

The Tribe emphasizes that article IV, section 19(f) of the California Constitution "authorize[s]" the Governor to "negotiate and conclude compacts . . . in accordance with federal law," and argues that the state "laws enabling and governing the regulation of class III gaming clearly import and implement, both implicitly and explicitly, the rights and obligations of states

---

[7] When one is "authorized" to do something, one is "empower[ed]" to do that thing. *Authorize*, Meriam-Webster.com, https://www.merriam-webster.com/dictionary/authorize (last visited Aug. 26, 2026).

and tribes in IGRA." *Id.* at 17. This argument is not persuasive. The state provisions do not import IGRA's requirement to negotiate compacts in good faith as an independent obligation under state law. *See* Cal. Const., art. IV, § 19(f); Cal. Gov't Code § 12012.25(d). Rather, they authorize the Governor to negotiate the compacts on behalf of the state. *See* Cal. Const., art. IV, § 19(f); Cal. Gov't Code § 12012.25(d).

Accordingly, the Tribe fails to state a claim on its claims arising under state law.[8] As the Tribe's state law claims "lack[] a cognizable legal theory," they are dismissed without leave to amend. *Foley v. Bates*, No. C07-0402 PJH, 2007 WL 1430096, at *7 (N.D. Cal. May 14, 2007) (citing *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988)).

**V. <u>Conclusion and Order</u>**

As the Tribe fails to state a claim on its State law causes of action, the State's motion to dismiss the sixth, seventh, and eighth causes of action, Doc. 19, is **GRANTED**.

IT IS SO ORDERED.

Dated: August 27, 2026

UNITED STATES DISTRICT JUDGE

[8] Given this conclusion, the Court need not address the State's remaining arguments.